IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. THORNE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOHNATHON J. THORNE, APPELLANT.

Filed September 3, 2019.    No. A-19-395.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Ernest H. Addison, Jr., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Johnathon J. Thorne, age 16 at the time of his charged offenses, appeals from the Douglas County District Court's order denying his motion to transfer his pending criminal proceeding to the juvenile court. Finding no abuse of discretion, we affirm.

## II. BACKGROUND

### 1. POLICE REPORTS

Police reports indicate that Thorne, born in November 2001, was involved in a number of instances in August 2018 during which vehicles were taken at gunpoint. They also provide that Thorne was involved in a drive-by shooting which resulted in a victim being shot in the neck.

- 1 -

At approximately 12:25 a.m. on August 11, 2018, Ethan Zotti had his gold 2007 Honda CR-V taken from him at gunpoint on North 105th Street in Omaha, Nebraska. Zotti told officers that he was approached by three black male suspects; one of the suspects pointed a revolver at him, and demanded and took his Honda CR-V. At approximately 8:23 p.m. on August 12, Zotti's Honda CR-V was involved in a hit-and-run accident at 21st and Castellar Street in Omaha; three black male juveniles were seen fleeing the accident scene.

At 10:30 p.m. on August 12, 2018, Jose Marroquin-Sandoval had his grey 2003 Toyota Tundra pickup truck taken from him at gunpoint on South 18th Street in Omaha by three unknown black male suspects; it was noted at the time that the suspects appeared to match the description of the suspects that had fled the scene of the Honda CR-V robbery. The area was also near the scene of the hit-and-run accident.

At 11:47 p.m. on August 12, 2018, Cory Brown had his black 2010 Toyota RAV4 taken from him at gunpoint by two unknown black male suspects on North 104th Court in Omaha.

At 11:48 p.m. on August 15, 2018, Cole Amato had his black 2012 Chevy Malibu (black rims on one side and silver rims on the other) taken from him by force by two unknown black male suspects on Wirt Plaza in Omaha. (Both Marroquin-Sandoval's Toyota Tundra and Brown's Toyota RAV4 were found in the nearby area.)

At 7:14 p.m. on August 23, 2018, there was a shooting on North 66th Street in Omaha, and the suspect vehicle appeared to be Amato's Chevy Malibu. A black Chevrolet Malibu (black rims on one side and silver rims on the other side) chased a gray Lexus sedan northbound on North 66th Street; a witness saw a "black arm" holding a black revolver reach out from the passenger side window of the Malibu, and shots were fired at the Lexus (from another witness' surveillance video, that included audio, officers could hear 6 to 7 shots fired). The Lexus crashed into a tree. The driver of the Lexus (Destin Martinez) suffered a gunshot wound to the neck and a dislocated hip. The passenger of the Lexus (John Green) suffered a shoulder injury.

At 9:10 p.m. on August 23, 2018, Jacob Rauterkus had his red 2009 Honda CR-V taken from him at gunpoint by two unknown black male suspects on North 105th Plaza in Omaha. About 45 minutes later, police officers observed the Honda CR-V at a high school and engaged in a vehicle pursuit; the Honda CR-V was later found abandoned at a different location.

In the days following the August 23, 2018, shooting, Thorne was identified as a suspect, along with two other males (C.W. and Troy Maben, Jr.), after officers reviewed shopping mall security footage; the victims from the Lexus shooting, Martinez and Green, had been involved in an altercation with the suspects at the shopping mall moments before the shooting occurred. Martinez and Maben (who was allegedly in the Malibu) were apparently "rival [g]ang members."

C.W., a 16-year-old juvenile, was located on August 28, 2018, and taken to police headquarters. During questioning, C.W. admitted to being in Zotti's gold 2007 Honda CR-V (driven by Thorne) when it was in the accident at 21st and Castellar Street, and admitted to fleeing the area. C.W. also admitted to knowingly participating in the robbery of Marroquin-Sandoval's vehicle shortly after the accident in Zotti's vehicle; C.W. advised that he did not know who had the gun in the robbery, but denied that it was him. C.W. then admitted to taking Amato's Chevy Malibu on August 15, and advised that he was with Thorne during the robbery, and that a semi-automatic handgun was used during the robbery. C.W. further advised that after being involved in the shooting, they parked the vehicle near his residence and began looking for a new

vehicle; he stated that he and Thorne walked to North 105th Plaza and took Rauterkus' Honda CR-V by force (C.W. denied being in possession of a firearm). C.W. stated that Thorne was driving the Honda CR-V after the robbery and, after a vehicle pursuit, they abandoned the vehicle and ran. At the end of the interview, C.W. was booked on various charges. Although C.W. implicated Thorne in the various robberies, he did not implicate Maben.

Maben, 20 years old, was located on August 29, 2018. He was arrested on a warrant and booked into the Douglas County Jail. During questioning by law enforcement, Maben denied any involvement with the robberies. Maben also denied being in the car during the shooting, handling a firearm, or knowing anything about a shooting.

Thorne was located and arrested on August 31, 2018, and taken to the Douglas County Youth Center (DCYC). One police report states that Thorne is a "known" gang member.

## 2. CRIMINAL CHARGES

On October 26, 2018, the State filed an information charging Thorne with: Count 1, first degree assault, a Class II felony (Martinez was the named victim); Counts 2 and 4, use of a deadly weapon (firearm) to commit a felony, each a Class IC felony; Count 3, discharging a firearm while in or in proximity of any motor vehicle at any person, dwelling, building, structure, occupied motor vehicle, a Class IC felony; Count 5, theft by receiving $5,000 or more, a Class IIA felony (Zotti was the named victim); Counts 6 to 9, robbery, each a Class II felony (Marroquin-Sandoval, Brown, Amato, and Rauterkus were the named victims); and Count 10, operating a motor vehicle to avoid arrest, willful reckless driving, a Class IV felony. Counts 5 to 8 were alleged to have occurred on August 12. Counts 1 to 4, 9, and 10 were alleged to have occurred on August 23.

## 3. HEARING ON MOTION TO TRANSFER

Thorne filed a motion to transfer his case to juvenile court, and a transfer hearing was held on March 18, 2019. At the hearing, the State did not call any witnesses to testify, but it did offer four exhibits, which were received into evidence without objection for purposes of the transfer hearing. Exhibit 1 contained the police reports in the instant case, the details of which we have set forth previously. Exhibit 2 contained entries from Thorne's juvenile court record. Exhibit 3 contained pleadings and orders from a previous juvenile court case wherein on January 3, 2017, Thorne was originally charged with theft by unlawful taking, robbery, and obstructing a peace officer; on January 23, he pled no contest and was adjudicated on the theft by unlawful taking and obstruction of a peace officer; and in March he was placed on probation for an "open-ended period of time" with various terms of probation (i.e., complete dual diagnosis intensive outpatient treatment, cooperate with GPS monitoring/tracker services, attend school daily, participate in tutoring if needed, complete a cognitive behavior group, and participate in gang intervention/prevention services); his probation was revoked both in June 2017 and September 2018. Exhibit 4 contained pleadings and orders from a previous juvenile court case wherein on November 27, 2017, Thorne was charged with robbery; on December 18, he pled no contest and was adjudicated, and he was placed on probation "for an open ended period of time," was ordered to remain detained at DCYC until further order of the court and application was to be made for group home placement, and he was to complete intensive outpatient treatment; his probation was revoked in September 2018.

In support of his motion to transfer, Thorne also offered four exhibits, which were received into evidence without objection for purposes of the transfer hearing. Exhibit 5 was a letter written by Thorne to the district court. Exhibit 6 was a letter from Barbara Steinke, a therapist at DCYC, stating that she had seen Thorne once or twice a week since September 5, 2018 (he actively participated in sessions and discussed ways to manage stress; had always been kind, respectful, compliant, and open to receiving feedback; and was goal-oriented as evidenced by his recently completing all credits to graduate high school). Exhibit 7 was an affidavit from Thorne's father. And exhibit 8 was a certificate of achievement acknowledging that Thorne had successfully completed all of his credits toward graduation.

Thorne also called one witness, Kathleen Henrichs, to testify at the hearing. Henrichs is a "specialized probation officer in Douglas County for juvenile court," and she "deal[s] with the high-risk youth." She was first assigned to supervise Thorne in March 2017, after he was placed on probation for theft and obstruction; and in November, he was placed on probation for robbery. When she first began working with Thorne in early 2017, Henrichs believed that Thorne was "pretty immature," and that he lacked the appropriate skills to deal with stress or anxiety. When asked if she believed Thorne exhibited skills that reflected a sophistication in terms of self-supporting skills, Henrichs responded, "At that point, no." Henrichs stated, "When [Thorne is] around positive peers, he does well. When [Thorne] is around negative peers, he does not do well." Henrichs testified that Thorne has had a dual diagnosis evaluation, a psychological evaluation, and then another co-occurring evaluation; the evaluations recommended intensive outpatient treatment with a dual diagnosis provider because Thorne had both mental health and substance use issues. Henrichs stated that in Thorne's original evaluation in February 2017, he was diagnosed with "persistent depressive disorder, oppositional defiant disorder, and then cannabis use as well." And in the "most recent evaluation" completed in December 2017, Thorne was diagnosed with "conduct disorder and cannabis use disorder." "Two attempts were made to have [Thorne] complete intensive outpatient treatment at Boys Town," but "he did not complete the programs." He did, however, successfully complete outpatient therapy at Clarinda Academy in June 2018, and went to live with his father on June 11. Thorne had previously been living with his mother, but there was a lot of conflict between Thorne and his mother, and before he was discharged from Clarinda Academy, his mother had been "picked up" on some possession charges; the juvenile court ordered that the mother would have to do random urinalysis testing and a "CD" evaluation before Thorne could reside with her, so Thorne was placed with his father.

According to Henrichs, on June 24, 2018, "about two weeks after he returned from Clarinda Academy," Thorne was the victim of a drive-by shooting, and was "shot in his upper right arm." Henrichs knew "they couldn't take the bullet out," and that Thorne "has had surgery to do repair to some nerve damage," and "[he] doesn't really have mobility in his right hand as a result of the injury." Henrichs' understanding was that Thorne "potentially could have mobility with some physical therapy."

On June 25, 2018, the day after he was shot, Thorne absconded and his whereabouts remained unknown until he was detained on the current charges in August.

Regarding the current case, Henrichs believed that Thorne was "picked up" on August 31, 2018, and said he had been detained ever since. She continued to see Thorne weekly. "He has been on Level 4 a majority of the time that he's been [at DCYC]," which she described as being "the

highest level that they can be at." There was "one incident where [Thorne] was accosted in the hallway and he defended himself, and there was another incident where he lost his level for a short time when he helped a friend." For all but "less than [one] week" since his detainment in August, Thorne has been reported as doing well. It was Henrichs' understanding that, while at DCYC, Thorne completed all of the credits required for high school and would be "graduating early from high school" on May 25, 2019. In the 5 years that she has supervised, Henrichs has only had one other person graduate high school while detained. As far as furthering his education, Henrichs stated that Thorne "is a little up in the air about whether he wants to do a trade such as a CDL license or construction, or if he wants to do a four-year college."

Henrichs testified, "Currently, the status of [Thorne's] case in juvenile court -- it's been revoked and we're awaiting disposition. . . . [M]y recommendation on probation's end would be that he be committed to the YRTC, Kearney, if he were to continue to move through the juvenile court." When asked if Thorne would have to participate in programs if committed to YRTC to return to community-based services, Henrichs said, "It's a behavioral program and they have a level system and they have to exhibit certain behaviors before they can successfully complete the program and be allowed to return to the community"; from her experience, that would take about 4 to 6 months, "but that can vary greatly based on the individual's participation." "Upon completion of the YRTC, we do what we call a long-term planning or intensive supervision. So [Thorne] potentially would return home if the Court gave approval with services as he transitioned back to the environment." When asked if Thorne could be placed in a secure environment to continue with other treatment or therapy, Henrichs said, "I have not seen that happen after they successfully complete YRTC." When asked if there would be another option, such as a Clarinda facility, where Thorne would be required to stay there and continue with the treatment before being allowed to go home, Henrichs responded, "Not that I'm aware of."

When asked if, based upon her interaction with Thorne for almost 2 years, she thought he could still benefit from the services offered through the juvenile court, Henrichs responded, "I do. As I said before, when [he's] within a positive environment with positive people, he has a lot of potential." She thought it "would be difficult for [Thorne] to be successful in an environment where he's had the opportunity to be around negative peers, not motivated, that kind of thing." As for whether Thorne would be able to make the necessary changes for him to be successful, Henrichs felt "like [Thorne] genuinely wants things different," but she "couldn't answer the question as to whether behaviorally he will be able to do so." She believed that Thorne could "continue to benefit from programming therapy services to continue to learn to make better decisions." "He has expressed on numerous occasions that he's happy to comply with whatever the juvenile court could order."

When asked if it was fair to say, based upon her interaction with Thorne, that he was beginning to understand and appreciate the seriousness involved with this matter, Henrichs responded, "Yes."

On cross-examination, Henrichs was asked what she believed Thorne could achieve at YRTC in those 4 to 6 months that he had not already received or benefitted from in his two "stints" with Boys Town and his successful completion of treatment at Clarinda. She responded:

> I mean, he's obviously [completed his credits for] . . . his high school diploma. So my
> understanding is that he would receive some job training during the daytime while he's

there. I don't know the extent of that. I know that they do screen youth both for mental health and substance use, so they can receive therapy while they're there. And, also, if they screen high enough, can receive referral to Hastings Regional Center depending upon the level of need for substance use treatment. Again, it's behavioral programming. They try to address or target specific behaviors that lead to the referrals and they work through a level system. Beyond that, I guess I'm not too familiar with what other services they offer.

When asked if those were some of the same tools and techniques that have been used with Thorne since 2017, Henrichs said, "It would be similar to a group-home placement." Henrichs acknowledged that if this case is transferred to the juvenile court and the judge orders Thorne to go to YRTC, the long-term planning after he successfully completes that program would be similar to the plan he had after completing Clarinda Academy (e.g., in-home services to help with structure and supervision and expectations in the house, individual and family therapy, drug testing, having positive role models).

On April 16, 2019, the district court entered an order finding there was a sound basis to retain jurisdiction and therefore the motion to transfer was denied. An "order nunc pro tunc" was filed on April 24 and corrected a factual error within the April 16 order. Further details from the court's corrected order will be set forth later in our analysis.

## III. ASSIGNMENT OF ERROR

Thorne claims the district court erred when it denied his motion to transfer the case to juvenile court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. MOTION TO TRANSFER TO JUVENILE COURT

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent original jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 to 17 years of age and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all but one of the allegations against Thorne put him within this second category of juvenile offenders. The State chose to initiate proceedings in district court, and Thorne subsequently moved to have his case transferred to juvenile court. See Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2018) (in part provides mechanism for accused person, who was younger than 18 years of age at time alleged offense was committed, to motion to have his or her case transferred from county or district court to juvenile court, and procedures to be followed following filing of such motion).

When Thorne moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Reissue 2016):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a) and (b).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

Thorne contends the State failed to meet this burden; therefore, we next consider the district court's discussion of each of the transfer factors and the evidence relied upon in the court's ultimate determination that the factors favored retention over transfer.

## 2. JUVENILE TRANSFER FACTORS

The district court made findings as to the factors contained in § 43-276(1), which "shall be considered" at a hearing under § 29-1816(3)(a). We summarize the factors the district court concluded favored retaining jurisdiction.

(a) Factors Favoring Retention in District Court

In its order, the district court set forth its findings that favored retaining jurisdiction. In our review of the court's order, it appears the court found the majority of the factors set forth in § 43-276(1) favored retaining jurisdiction in the district court, namely: (b) evidence that the alleged offenses included violence; (d) Thorne's age; (e) Thorne's previous history; (f) best interests of Thorne; (g) consideration of public safety; (h) Thorne's ability to appreciate the nature and seriousness of his conduct; (i) whether Thorne's best interests and the security of the public may require that Thorne continue in secure detention or under supervision for a period extending beyond his minority and, if so, the available alternatives best suited to this purpose; (l) whether Thorne has been convicted of or has acknowledged unauthorized use or possession of a firearm; and (n) whether Thorne is a criminal street gang member.

The district court's order, as corrected, stated "that all of these current charges are extremely serious in nature and involve serious concern for public safety." The court "specifically note[d] the severe violence that several of these charges represent." The court said it "is always greatly concerned any time a firearm is used in the commission of a crime." "It is alleged that [Thorne] was the driver of the vehicle when the other two co-defendants fired a pistol out the window of the vehicle at the victim's vehicle. They allegedly shot several rounds towards the victim's vehicle." "The driver of the victim's vehicle was struck in the neck by a bullet which caused him to crash head on into a tree. He suffered facial fractures and lacerations, an arterial bleed in his face and a dislocated hip as a result of the collision." "The front passenger of the victim's vehicle suffered a serious shoulder injury." The court stated, "Upon review of all of the facts involved in the shooting incident, this Court is left with no doubt that [Thorne] [is] very lucky [he is] not charged with murder."

The district court said it was "not certain" that Thorne is an active gang member," "but clearly it appears that way since he associates with them."

The district court's order addressed Thorne's juvenile record, which included orders of probation in 2016 (for drug paraphernalia and possession of less than one ounce of marijuana) and twice in 2017 (once for theft by unlawful taking and obstructing an officer; and once for robbery). The court stated, "there are some services provided by the Juvenile Court that [Thorne] has not yet received the benefit of. Although it is clear that the services that he did receive for his prior juvenile charges had zero effect upon him, even his time in Clarinda[.]" The court found that "any additional services provided by the Juvenile Court would not have enough positive effect upon [Thorne] who has voluntarily and intentionally committed the offenses that he is currently charged with." The court found that Thorne "certainly understood" the seriousness of his actions at the time of the charged offenses, and that a transfer of this matter to the juvenile court would only leave approximately 2 years before that court would lose jurisdiction. The district court "[did] not see that to be sufficient time to accomplish successful rehabilitation."

The district court found that it was in the best interest of Thorne, and for the security of the public, that Thorne remain in the jurisdiction of the district court.

(b) Remaining Statutory Considerations

No specific findings were made regarding the remaining factors set forth in § 43-276(1), namely: (a) the type of treatment Thorne would most likely be amenable to, (c) Thorne's

motivation for the commission of the offense, (j) whether a victim agreed to participate in mediation, (k) whether there was a juvenile pretrial diversion program pursuant to §§ 43-260.02 to 43-260.07, and (m) whether a juvenile court order had been issued for Thorne pursuant to § 43-2,106.03. "[T]hough it would have been preferable for the district court to refer to all the statutory considerations, the statute does not require it to do so." *State v. Tyler P.*, 299 Neb. 959, 971, 911 N.W.2d 260, 269 (2018).

### 3. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

As noted earlier, in order to retain the proceedings, a trial court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. See *State v. Stevens, supra*. Further, a trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

In this case, the district court found that a majority of the factors set forth in § 43-276(1) favored retaining the case. However, Thorne argues that "under the totality of the circumstances," this case should have been transferred to the juvenile court. Brief for appellant at 15.

Thorne contends that the State failed to satisfy its burden of proof to establish a basis for the district court to retain jurisdiction. Thorne argues the State offered no evidence that he could not be successfully rehabilitated or that "there was no need for or benefit to be obtained from further rehabilitation in this matter." Brief for appellant at 12. He points to Henrichs' testimony where she opined that Thorne would benefit from the types of services available in juvenile court (e.g., therapy, chemical dependency treatment, and mental health treatment), and her belief that Thorne was motivated to change and was willing to participate in recommended programs. Thorne also notes Henrichs' testimony that if this matter was transferred to juvenile court, Thorne would not be immediately placed into community based services because his probation (in another juvenile case) had been revoked. Thus, Thorne would be committed to YRTC where he would have to successfully complete behavioral programs before being considered to return to the community. While this is true, Henrichs also testified that an individual typically completes the YRTC program in 4 to 6 months, and after successful completion of the program, Thorne would be allowed to go home. Henrichs was not aware of any other option that could be required for Thorne to continue with other treatment or therapy. And she acknowledged that if this case is transferred to the juvenile court and the judge orders Thorne to go to YRTC, the long-term planning after he successfully completes that program would be similar to the plan he had after completing Clarinda Academy (e.g., in-home services to help with structure and supervision and expectations in the house, individual and family therapy, drug testing, having positive role models).

The district court acknowledged there were some services provided by the juvenile court that Thorne had not yet received the benefit of, but also stated that the services he had received for his prior juvenile charges, including his time at Clarinda Academy, had "zero effect upon him." The State claims, and the record reflects, that "[e]ven [Thorne's] successful completion of Clarinda Academy [in June 2018] did nothing to stop his criminal behavior." Brief for appellee at 20. "[I]ncredibly, just two weeks after completion of a nearly 6 month program he absconded and went on a carjacking robbery spree that ended with him being involved in what is alleged to be a gang

related drive by shooting." *Id*. He was detained on the current charges on August 31, 2 months after he had absconded. The court found that additional services would not have enough positive effect on Thorne, noting there were approximately 2 years before the juvenile court would lose jurisdiction. As is often the problem in cases involving juveniles who are within a few years of turning 19, courts are rightfully concerned that there may be insufficient time to ensure that rehabilitation will be successful. Because Nebraska law does not authorize the juvenile court to retain jurisdiction over a defendant once he or she turns 19, the age of the juvenile defendant is a significant factor when balancing public safety against the juvenile defendant's obvious best interests in being provided opportunities for rehabilitation in the juvenile court.

Thorne also contends there was no evidence to support the district court's conclusion that he understood the nature and seriousness of his conduct. However, having been the victim of a drive-by shooting himself, Thorne certainly should have understood the nature and seriousness of his conduct.

Thorne has been charged in a 10-count information with serious crimes and numerous victims. Although there is some evidence which would support providing Thorne with further attempts at rehabilitation through the juvenile court system, we cannot say the district court abused its discretion by finding that the statutory factors favored retaining the case. Notably, the record supports that Thorne's need for supervision and treatment will likely extend beyond the time the juvenile court would have jurisdiction over him; this is a reasonable concern given that Thorne's past rehabilitation efforts offered through the juvenile court failed to deter the presently charged conduct. When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt, supra*.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order denying Thorne's request to transfer jurisdiction of the case to the juvenile court.

AFFIRMED.